[Cite as *Cottrell v. Cottrell*, 2014-Ohio-646.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| ROBERT W. COTTRELL, | : | CASE NO. CA2013-07-065 |
| Plaintiff-Appellant, | : | |
| | : | O P I N I O N<br>2/24/2014 |
| - vs - | : | |
| | : | |
| KATHLEEN COTTRELL, | : | |
| Defendant-Appellee. | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 10DR33517

Dan D. Weiner, 4848 Marshall Road, Kettering, Ohio 45429-5723, for plaintiff-appellant

Kathleen Cottrell, 116 Beam Drive, Franklin, Ohio 45005, defendant-appellee, pro se

**M. POWELL, J.**

{¶ 1} Plaintiff-appellant, Robert W. Cottrell (Father), appeals a decision of the Warren County Common Pleas Court, Domestic Relations Division, finding Father's substantive due process rights were not violated by the imposition of Warren County's Basic Parenting Schedule.[1] For the reasons set forth below, we affirm the decision of the trial court.

---

1. Pursuant to Loc.R. 6(A), we have sua sponte removed this appeal from the accelerated calendar.

## I. BACKGROUND

{¶ 2}   This case has previously been appealed to this court under *Cottrell v. Cottrell*, 12th Dist. Warren No. CA2012-10-105, 2013-Ohio-2397 (*Cottrell I*).  The sole issue pertinent to this appeal is whether Warren County's Basic Parenting Schedule which provides that parenting time for children 16-18 years of age "shall not be limited other than as the child and the non-residential parent choose," denies Father his fundamental right to the care and custody of his minor child.  The following facts are pertinent to this appeal.  For additional facts, see our decision in *Cottrell I.*

{¶ 3}   Father and defendant-appellee, Kathleen Cottrell (Mother), were married for several years, having one child together, Alan, born June 19, 1996.  Father filed for divorce in March 2010 and, after a contested hearing, the trial court issued a "Decision" regarding the divorce on July 22, 2011.  In the Decision, the trial court adopted the parties' proposed shared parenting plan which was requested by Alan during an in camera interview with the trial judge.  Although the final decree of divorce and agreed shared parenting plan were not filed until September 9, 2011, the parties began complying with the shared parenting plan in late July or early August 2011.

{¶ 4}   The shared parenting plan provided that Father and Mother were to have equal parenting time with Alan on an alternating week-to-week basis.  However, near the end of September 2011, Alan indicated he wanted to spend all of his time with Mother and, despite the parenting time provisions of the shared parenting plan, refused parenting time with Father.  Therefore, on December 13, 2011, Mother moved to modify the shared parenting plan, seeking full custody of Alan with Father receiving "standard" visitation.  Mediation was ordered.  The mediator encouraged Father to attempt "baby steps" with Alan to repair rifts in their relationship.  Though Father attempted to see Alan weekly on Wednesday evenings, Alan refused to visit with Father approximately half the time.

- 2 -

{¶ 5}    Consequently, a magistrate hearing was held on Mother's motion to modify on May 9, 2012, and July 12, 2012.  The magistrate conducted an in camera interview with Alan on May 23, 2012.  Alan was 16 years old at the time of the interview and was determined by the magistrate to be "sufficiently mature" to have his wishes considered in determining his best interests.  During the in camera interview, Alan expressed his "firm" desire to reside with Mother and have no visitation with Father.

{¶ 6}    At the hearing and during the in camera interview, evidence was presented that Alan is resentful of Father due to certain arguments and incidents that have undermined their relationship.  Those incidents are detailed in *Cottrell I.*  The magistrate specifically found that these incidents resulted in alienating Alan from Father.

{¶ 7}    After hearing evidence from Father, Mother, and Alan, the magistrate issued a decision on July 20, 2012, determining that, based upon "the deterioration in the relationship between the parties," "the relationship between Alan and Father," and Alan's desires, the week-to-week shared parenting arrangement is "no longer in Alan's best interest."  Therefore, the magistrate designated Mother as sole residential parent and legal custodian of Alan.  However, rather than giving effect to Alan's desire not to visit with Father, the magistrate determined it was in Alan's best interest that parenting time between he and Father be in accordance with Warren County's Basic Parenting Schedule for children between 16 and 18 years of age (the "16-18 Schedule").  The 16-18 Schedule provides as follows:

> **TEENAGERS – AGE 16 UNTIL 18:**
> Parenting time for children in this age bracket shall be fixed between the child and the non-residential parent.  Parenting time shall not be limited other than as the child and the non-residential parent choose.

The magistrate further provided, "Inasmuch as parenting time for a 16 year old child is to be determined between the nonresidential parent and the child," Father shall attend counseling with Alan and Mother and is required to cooperate in the counseling and take part if

necessary.

{¶ 8} Father objected to the magistrate's decision. Father's objections were overruled by the trial court and the magistrate's recommendations were adopted in full on October 1, 2012.

{¶ 9} Father appealed the trial court's ruling on his objections on several grounds, including whether Father's constitutional rights were violated by the imposition of the 16-18 Schedule. We overruled the majority of Father's arguments on appeal. However, finding that the trial court failed to rule upon Father's objection relating to whether parenting time pursuant to the 16-18 Schedule violated Father's substantive due process right to the care, custody and management of his child, we remanded the matter to the trial court on that sole issue. *Cottrell I*, 2013-Ohio-2397 at ¶ 57.

{¶ 10} On remand, the trial court issued a decision finding that the imposition of the 16-18 Schedule does not violate Father's substantive due process rights. In its June 14, 2013 decision, the trial court found that the schedule defines the relationship between the parents and not that between the nonresidential parent and the child. According to the trial court, the "language regarding the nonresidential parent and the child choosing the parenting time merely delineates that the authority to schedule the parenting time does not belong to the residential parent." The trial court went on to state:

> The child is not the sole decision-maker regarding when and whether parenting time will occur. Should the child refuse to participate in parenting time with the non-residential parent, the parent has three options: (1) the parent may request that the domestic relations court order the residential parent to take the child to counseling with the non-residential parent; (2) the parent may initiate a proceeding in juvenile court to compel the child to participate in parenting time; or (3) the parent may request the Court to establish a definite schedule. Therefore, the Court in no way precludes parents from spending time with their children by ordering the Basic Parenting Schedule for sixteen to eighteen-year-old teenagers, and parents' due process rights to parent their children are not violated.

## II. ANALYSIS

{¶ 11} From the trial court's decision on remand, Father appeals, raising two assignments of error:

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT'S DECISION AND ENTRY UPON REMAND DENIES [FATHER'S] CONSTITIONAL [SIC] DUE PROCESS RIGHTS AND HIS PARENTING RIGHTS UNDER THE 14TH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 14} Assignment of Error No. 2:

{¶ 15} THE TRIAL COURTS [SIC] STANDARD PARENTING ORDER REGARDING CHILDREN 16 YEARS OF AGE AND OLDER VIOLATES [FATHER'S] SUBSTANTIVE CONSTITIONAL [SIC] RIGHTS UNDER THE 14TH AMENDMENT OF THE U.S. CONSTUTION [SIC] AND ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 16} In both assignments of error, Father argues his substantive due process rights were violated by the trial court's June 14, 2013 decision and the implementation of the 16-18 Schedule. Specifically, Father contends the trial court's decision and the 16-18 Schedule permit a minor child to determine parenting time with the nonresidential parent and, therefore, violates the nonresidential parent's "constitutionally protected fundamental interest in the care, custody, and management of their children." In addition, Father asserts for the first time on appeal that the 16-18 Schedule fails to set forth a "specific schedule" of parenting time in violation of R.C. 3109.051(A).

### A. Substantive Due Process

{¶ 17} "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054 (2000). The United States Supreme Court has "long recognized that the

Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Id.*, citing *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258 (1997). "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel* at *id.*, citing *Glucksberg* at 720; *Reno v. Flores*, 507 U.S. 292, 301-302, 113 S.Ct. 1439 (1993).

{¶ 18} If a party argues that a government regulation impinges upon a fundamental constitutional right, courts must apply a strict-scrutiny standard of review. *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, ¶ 39. Under the strict-scrutiny standard, a regulation that infringes on a fundamental right is unconstitutional unless the regulation is narrowly tailored to promote a compelling governmental interest. *Id.*, citing *Chavez v. Martinez*, 538 U.S. 760, 775, 123 S.Ct. 1994 (2003).

{¶ 19} The liberty interest of parents in the care, custody, and management of their children is perhaps the oldest of the fundamental liberty interests recognized by the United States Supreme Court. *Troxel* at 65. As explained by the Supreme Court in *Troxel*:

> More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535, 45 S.Ct. 571 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535, 45 S.Ct. 571. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166,

- 6 -

64 S.Ct. 438.

*Troxel*, 530 U.S. at 65-66. Furthermore, the Supreme Court has recognized that its "jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J. R.*, 442 U.S. 584, 602, 99 S.Ct. 2493 (1979).

{¶ 20} Thus, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel* at 66; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982); *In re Bayless*, 12th Dist. Warren No. CA90-09-064, 1991 WL 274312, *2 (Dec. 23, 1991). Accordingly, the strict-scrutiny standard must be applied in this case. The issue before us, then, is whether the trial court's implementation of the 16-18 Schedule was narrowly tailored to promote a compelling government interest. Promoting the best interests of children is such a compelling government interest. In this case, we find that the application of the 16-18 Schedule, in conjunction with the implementation of counseling, was narrowly tailored to promote the compelling government interest of insuring that the best interests of children are observed in the allocation of parental rights and responsibilities.

{¶ 21} Father posits the issue here as one in which the trial court has denied him all manner of visitation with his son. This does not accurately reflect the trial court's order. Rather, the trial court's order seeks to implement visitation between Father and Alan in a manner that accommodates both Father's fundamental right to the care, custody and management of his son, and Alan's best interests. R.C. Chapter 3109 "grants the trial court broad authority to restrict visitation." *Jannetti v. Nichol*, 7th Dist. Mahoning No. 97-CA-239, 2000 WL 652540, *3 (May 12, 2000). This includes "the power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." *Id.*

- 7 -

Pursuant to this broad authority, the trial court implemented the 16-18 Schedule/counseling order.

{¶ 22} Clearly, the 16-18 Schedule, by its terms, does not restrict or suspend Father's visitation with Alan. Father's argument is premised upon his belief that Alan will not agree to visit with him and, therefore, as a practical matter, the 16-18 Schedule denies him visitation with Alan. There is nothing to suggest that Alan would visit with Father if the court had ordered specific visitation. In fact, Alan refused to visit with Father in accordance with the prior shared parenting plan and at least half the time after mediation.

{¶ 23} Furthermore, the 16-18 Schedule, as argued by Father, does not give Alan sole authority to refuse visitation. The 16-18 Schedule provides that "[p]arenting time shall not be limited other than as the child *and* the non-residential parent choose." (Emphasis added.) The 16-18 Schedule is written in the negative and the conjunctive, in that it prohibits "limitation" of parenting time except as agreed by Alan and Father. If Alan is limiting parenting time in a manner not agreeable to Father, then the 16-18 Schedule would provide a basis upon which Father may move the trial court for further orders relating to parenting time with Alan, including a specific parenting time order.

{¶ 24} Additionally, implementation of the 16-18 Schedule cannot be viewed in isolation from the order for counseling intended to improve the relationship between Father and Alan. It is not the 16-18 Schedule which denies Father visitation with Alan. Rather, Father's lack of visitation with Alan is a consequence of their strained relationship which the trial court sought to remediate with the inclusion of an order for counseling.

{¶ 25} The dissent rightly emphasizes the fundamental nature of the right of a parent to the care, control and management of one's children. While it is beyond debate that this fundamental right is protected by the due process clauses of the United States and Ohio Constitutions, notably, this due process component does not mandate the "set visitation" the

dissent suggests is necessary to satisfy due process. Rather, whether a parent's substantive due process right to the care, custody and management of his or her children is properly observed is situational. The trial court's decision to implement the 16-18 Schedule/counseling order was done in the context of a 16-year-old child's independent expression of a wish not to visit with his father and a history of that child refusing to visit with his father, contrary to court-ordered visitation, as a result of incidents found to have undermined the father-son relationship. The 16-18 Schedule/counseling order was specifically adapted to the exigencies of this situation and narrowly tailored to serve the best interests of Alan while observing Father's fundamental right to the care and management of his child. It is also important to note the setting from which the 16-18 Schedule/counseling ordered emanated. The matter was before the trial court upon Mother's motion to terminate the parties' shared parenting plan. Father did not seek the "set visitation" the dissent believes necessary to satisfy due process. This is not a situation where the trial court has found that Father is unsuitable to visit with Alan, thus precluding Father from seeking "set visitation." Remarkably, Father did not seek "set visitation" or to present additional evidence relating to this issue on remand.

{¶ 26} The dissent details the various incidents between Father and Alan, minimizes them and then discounts the effect they had on Alan's relationship with Father. Suffice it to say, the trial court had the opportunity to observe the witnesses as they testified, their demeanor, attitude and emotion, their body language and vocal inflections, and to interview Alan on two occasions. Based upon those observations, the trial court is in a superior position to judge whether the effect the incidents had on the father-son relationship was genuine or spurious, serious or trivial. *Trickey v. Trickey*, 158 Ohio St. 9, 13, (1952) ("In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and

observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record"). We decline the dissent's invitation to substitute our judgment for that of the trial court in such a matter.

{¶ 27} Accordingly, we find the implementation of the 16-18 Schedule was not unconstitutional as applied to this case.

**B. Statutory Provisions**

{¶ 28} In addition to his constitutional argument, Father raises a statutory argument for the first time in this second appeal. Specifically, Father claims the trial court's implementation of the 16-18 Schedule is a violation of R.C. 3109.051(A), which states that a trial court shall provide a "specific schedule of parenting time" for the nonresidential parent.

{¶ 29} In his objections to the magistrate's July 20, 2012 decision, Father argued his due process rights were violated by imposition of the 16-18 Schedule. The trial court did not address this argument, finding it too "vague and broad in nature" to be considered. *Cottrell I*, 2013-Ohio-2397 at ¶ 54. We remanded the issue to the trial court, holding that "Father did, with specificity and particularity, state a substantive due process argument that Warren County's Basic Parenting Schedule is a violation of his fundamental right to parent." *Id.* at ¶ 56. On remand, the parties did not further brief the issue and the trial court ruled, based upon the existing record, that Father's substantive due process rights were not violated by imposition of the 16-18 Schedule. No issue relating to compliance with R.C. 3109.051(A) was within this court's remand, nor was this issue raised by Father on remand. Now, for the first time on appeal, Father raises a statutory claim that the trial court violated R.C. 3109.051(A) by not providing Father a "specific schedule of parenting time."

{¶ 30} We find Father's statutory claim barred, as it is "well-established that an appellate court will not consider issues or arguments raised by the parties on appeal that were not raised to or considered by the trial court." *Cottrell I* at ¶ 52, quoting *Anderson v.*

*Anderson*, 12th Dist. Warren No. CA2009-03-033, 2009-Ohio-5636, ¶ 38, and citing *Moeller v. Moeller*, 12th Dist. Clermont No. CA2001-05-049, 2001 WL 1403103 (Nov. 13, 2001).[2] However, even if we were to consider Father's claim, we would find it to be without merit, as the trial court complied with R.C. 3109.04 and 3109.051 by terminating the shared parenting plan and granting Father parenting time through the 16-18 Schedule.

{¶ 31} R.C. 3109.04(A) permits the trial court, upon divorce, to "allocate the parental rights and responsibilities" for the care of a minor child through a shared parenting plan so that each parent shares in the aspects of the physical and legal care of the child. R.C. 3109.04(A)(2); R.C. 3109.04(D)(1). However, upon the request of one or both parents, the trial court may terminate the shared parenting plan and issue a modified decree for the allocation of parental rights and responsibilities for the care of the child in a manner consistent with the best interest of the child. R.C. 3109.04(E)(2)(c); R.C. 3109.04(A)(1). In making such a determination, the court must consider all relevant factors, including those listed under R.C. 3109.04(F)(1). *See Curry v. Curry*, 10th Dist. Franklin No. 10AP-437, 2010-Ohio-6536, ¶ 16.

{¶ 32} Additionally, "unless the trial court concludes that parenting time is not in a child's best interest, the trial court must 'make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs.'" *Id.* at ¶ 17, citing R.C. 3109.051(A). Whenever possible, the trial court should "ensure the opportunity for both parents to have frequent and continuing contact" with the child "unless frequent and

---

2. Father's substantive due process claim requires a far less stringent standard than providing Father a "specific schedule of parenting time" as required by R.C. 3109.051(A). Thus, the issue is separate and distinct from Father's constitutional argument.

continuing contact by either parent with the child would not be in the best interest of the child." R.C. 3109.051(A). To determine whether to grant visitation and to establish an appropriate parenting time schedule, the trial court may apply its "standard parenting time guidelines," but may deviate from the guidelines based upon the factors in R.C. 3109.051(D). *See* R.C. 3109.051(F)(2); *Lumley v. Lumley*, 10th Dist. Franklin No. 09AP-556, 2009-Ohio-6992, ¶ 16. A nonresidential parent who is displeased with his visitation rights may move to modify visitation under R.C. 3109.051. *Braatz v. Braatz*, 85 Ohio St.3d 40, 45 (1999).

{¶ 33} In this case, Mother and Father shared custody of Alan under a shared parenting plan until Mother moved to modify the plan pursuant to R.C. 3109.04(E). After a hearing on the motion, the trial court terminated the shared parenting plan and designated Mother residential parent and legal custodian. The trial court then implemented its "standard parenting time guidelines" by ordering Father have parenting time pursuant to Warren County's Basic Parenting Schedule. As Warren County's Basic Parenting Schedule is the "specific schedule of parenting time" referred to in R.C. 3109.051(A), the trial court followed the requirements of both R.C. 3109.04 and 3109.051 by terminating the shared parenting plan, designating one parent as residential parent and legal custodian, and granting the nonresidential parent a delineated parenting time schedule. *See* R.C. 3109.051(F)(2). If Father was displeased with the parenting schedule he received, he had every right to move to modify visitation under R.C. 3109.051. *See Braatz* at 45. However, Father has never moved to modify visitation.

### III. CONCLUSION

{¶ 34} We find Father's fundamental rights to the care, custody, and management of Alan, including his right to visitation, were not unconstitutionally infringed upon, as the trial court's order was narrowly tailored to serve the compelling government interest of observing the child's best interest in the allocation of parental rights and responsibilities. In so holding,

we note Father had, and still has, a series of options available to him to help facilitate visitation with Alan or to require Alan attend a set visitation schedule. Father may attend the court-ordered counseling or move the trial court to modify visitation under R.C. 3109.051.

{¶ 35} Accordingly, Father's first and second assignments of error are overruled.

{¶ 36} Judgment affirmed.

PIPER, J., concurs.

HENDRICKSON, P.J., concurs in part and dissents in part.

**HENDRICKSON, P.J., concurring in part and dissenting in part.**

{¶ 37} I respectfully concur in part and dissent in part from the majority's opinion. I concur with the majority that Father's statutory claim brought on appeal is not properly before this court. As Father failed to assert below that the trial court's visitation order violated R.C. 3109.051(A), the majority is correct that he cannot raise it now for the first time on appeal. However, for the reasons discussed below, I dissent from the remainder of the majority's opinion because I find that the trial court's visitation order, *as applied* in this case, was not narrowly tailored and results in a violation of Father's fundamental and constitutionally protected right to the care, custody, and control of his son.[3]

**Parents' Fundamental Rights**

{¶ 38} Although the majority cites case law recognizing the importance the United States Supreme Court has placed upon parents' right to the care, custody, and control of

---

3. My position here is not inconsistent with my position in *Cottrell I*, in which I joined the majority in finding that it was in Alan's best interest to terminate the agreed shared parenting plan and award Mother sole custody. It was evident from the evidence produced below that Mother and Father do not communicate or cooperate well with one another when it comes to parenting Alan. Therefore, the trial court did not abuse its discretion by determining that it was in Alan's best interest to terminate the parties' shared parenting plan.

- 13 -

their children, it chose to ignore the emphasis the highest court placed on this protected fundamental interest when finding that Father's substantive due process rights were not violated. I feel it is important to shed additional light on the level of protection that has been afforded to this special parental right over the years to fully appreciate its relevance in our society and judicial system. Both the United States Supreme Court and the Ohio Supreme Court have recognized the importance of the fundamental liberty interest parents have in the care, custody, and control of their minor children. In fact, this fundamental interest was recognized by the United States Supreme Court as "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054 (2000). In *Troxel*, the Court declared that "*[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.*" (Emphasis added.) *Id.* at 65-66, citing *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438 (1944).

{¶ 39} The fundamental right to parent is a liberty interest encompassed within, and protected by, the Fourteenth Amendment.

> The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." The Clause also includes a substantive component that "*provides heightened protection against government interference with certain fundamental rights and liberty interests.*"

(Emphasis added.) *Id.* at 65, citing *Glucksberg* at 720. *See also Reno v. Flores*, 507 U.S. 292, 301-302, 113 S.Ct. 1439 (1993).

{¶ 40} In recognizing the importance of this liberty interest in our society, the United States Supreme Court has stated, "[t]he history and culture of Western civilization reflect a *strong tradition* of parental concern for the nurture and upbringing of their children. This

- 14 -

*primary role* of the parents in the upbringing of their children is now established beyond debate as *an enduring American tradition*." (Emphasis added.) *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526 (1972). "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit *with broad parental authority* over minor children. *Our cases have consistently followed that course.*" (Emphasis added.) *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493 (1979). *See also Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258 (1997), citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571 (1925) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, *the 'liberty' specially protected* by the Due Process Clause includes the right[] * * * *to direct the education and upbringing* of one's children"). (Emphasis added.)

{¶ 41} Similarly, the Ohio Supreme Court has recognized the fundamental liberty interest that parents have in the care, custody, and management of their children. *See Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 372 (1998). The court has emphasized the importance of a parent's right in custody matters in several of its decisions. *See, e.g., In re Perales*, 52 Ohio St.2d 89, 97 (1997), citing *Clark v. Bayer*, 32 Ohio St. 299 (1877) (noting that "parents who are *'suitable' persons* have a *'paramount' right* to the custody of their minor children") (emphasis added); *In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (holding that "parents must be afforded *every procedural and substantive protection* the law allows") (emphasis added); *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979) (finding that the termination of parental rights "should be an *alternative of 'last resort'*") (emphasis added).

{¶ 42} This court has also recognized a parent's fundamental and constitutionally protected right to the care, custody, and control of one's child, holding that "[t]he right of natural parents to the care and custody of their child is *one of the most precious and*

*fundamental in law.*" (Emphasis added.) *In re Adoption of C.M.F.*, 12th Dist. Butler Nos. CA2013-06-090 and CA2013-06-091, 2013-Ohio-4719, ¶ 8. This holding is consistent with our position in *Baker v. Baker*, 12th Dist. Brown No. CA2002-04-008, 2003-Ohio-731, ¶ 10, where we held the following:

> There is a presumption that a *fit parent* acts in the best interests of her children and a *fit parent's decision regarding visitation should be afforded great deference.* * * * A fit parent's decision must be given special weight and the manner in which a statutory standard is applies with a visitation statute must not unconstitutionally infringe upon a parent's right to make decisions regarding the care, custody and control of her children.

(Emphasis added.)

**{¶ 43}** While the majority has at least acknowledged the importance placed by reviewing courts on parents' substantive due process right to the care, custody and control of their children, it is clear that the trial court did not. In its decision below, the trial court failed to follow or even mention our precedent in *Baker* that a fit parent's decision must be given special weight or that a fit parent's decision regarding visitation should be afforded great deference. Instead, the trial court merely concluded in its June 14, 2013 Decision that the Basic Parenting Schedule was in Alan's best interest. However, based upon the facts of this case, I find that it was not in Alan's best interest to severely curtail Father's parental rights by adopting the 16-18 Schedule.

**Best Interest Considerations**

**{¶ 44}** I recognize that there are circumstances where a trial court is entitled to restrict, or even deny, visitation between a parent and child. The United States Supreme Court and this court have historically recognized that the placement of a restriction or a complete denial of visitation is justified where the noncustodial parent has been deemed unfit or where there is a showing by clear and convincing evidence that visitation with the noncustodial parent presents a significant risk of serious emotional or physical harm to the child. *See Troxel*, 530

U.S. 57. *See also Otten v. Tuttle*, 12th Dist. Clermont No. CA2008-05-053, 2009-Ohio-3158; *King v. Hall*, 12th Dist. Warren No. CA2006-01-009, 2006-Ohio-5985; *Wilson v. Redmond*, 12th Dist. Madison No. CA2003-09-033, 2004-Ohio-3910; *Collins v. Collins*, 12th Dist. Fayette No. CA2003-06-007, 2014-Ohio-5653; *In re Nichols*, 12th Dist. Clermont No. CA97-11-102, 1998 WL 295937 (June 8, 1998); *In re Lamb*, 12th Dist. Butler No. CA95-01-006, 1996 WL 56077, *2 (Feb. 12, 1996). In such circumstances, it is in the child's best interest to limit or cease visitation with a nonresidential parent.

{¶ 45} However, in the present case, Father was not found unfit by the trial court, nor did mother establish by clear and convincing evidence that visitation between Father and Alan presents a significant risk of serious emotional or physical harm to Alan. Instead, the trial court relied upon the promotion of its compelling governmental interest, i.e. the best interest of the child, in justifying its infringement upon Father's fundamental right when it implemented the 16-18 Schedule. The trial court appears to have based its "best interest" finding, in part, on its determination that Father was responsible for the strained relationship between himself and Alan, and that it was therefore in Alan's best interest to restrict Father's visitation. In its October 1, 2012 Entry Overruling Objections to the Magistrate's Decision, the trial court paraphrased the magistrate's findings by noting that "the Magistrate found that Father's behavior 'undermined his relationship' with Alan" and that "Father's parenting 'methodology * * * is questionable and has caused alienation with his son.'"

{¶ 46} The magistrate also gave us a glimpse of her reasoning for restricting Father's visitation in other parts of her decision. For instance, in addressing Mother's motion to terminate the shared parenting agreement, the magistrate noted that "Alan has had several arguments or incidents with his Father that have undermined his relationship with his Father." As the trial court determined that it was in Alan's best interest to apply the 16-18 Schedule due to his strained relationship with Father, we need to carefully review the record to

determine whether the court was justified in placing the blame on Father as the sole cause for the problems in the father-son relationship.

{¶ 47} The record reveals several specifically mentioned "arguments or incidents" between Alan and Father which allegedly undermined Father's relationship with his son. In addressing Father's contempt motion against Mother for violating the shared parenting agreement and interfering with Father's parenting time, the magistrate noted Alan had informed her of two specific incidents.

{¶ 48} The first incident arose when Father addressed his son in front of Alan's girlfriend and her family about a lie Father believed Alan made about an Easter basket. The facts and details surrounding this incident are very limited in the record below. However, there is nothing in the record indicating that Father's accusations were without merit. According to the magistrate, "Father acknowledged the incident and defended his actions, based on the importance of teaching children not to lie." The magistrate concluded that "although Father's principles are sound, his methodology is questionable and has caused alienation by the son."

{¶ 49} The second incident identified by the magistrate occurred when Father took Alan to his attorney's house, an action which was improper under the terms of the shared parenting plan.[4] The record reveals that Father's attorney erroneously believed the magistrate had given him leave to talk to the child. The record further reveals that Alan was upset that he was forced to talk to Father's attorney against his own wishes and that the unannounced visit with Father's attorney had a negative impact on Father and Alan's relationship. Although I agree that this incident was probably not handled by Father in a

---

4. I agree with the majority that Father technically violated Section 15(B) of the Shared Parenting Plan, which states that "[t]he parents agree that it is inappropriate to involve the child in the divorce or to discuss financial matters with the child." However, as discussed above, such action was done so on the advice of counsel.

proper manner, I do not find that this single incident is sufficient by itself to reach the conclusion that it was in Alan's best interest to deprive Father of his fundamental right to the care, custody, and control of his son.

**{¶ 50}** In addition to these two incidents noted by the magistrate, Mother testified that Alan decided to stay at her home and not visit with Father any longer because of two other separate incidents.[5] Mother claimed Alan indicated he no longer wanted to stay with Father because the two of them constantly argued. One particular argument involved whether Father would pay for half of Alan's new homecoming outfit. Father felt that Alan could have worn his outfit from the last school dance and Alan, therefore, did not need new clothing. This resulted in Father not reimbursing Mother for half of the $140 Mother spent on Alan's new homecoming attire.

**{¶ 51}** Mother also relayed that Father and Alan argued about a dental appointment Father had made for Alan. The appointment in question fell within the week Alan was residing with Mother. Alan claimed he was not informed about the dental appointment until an hour before the scheduled appointment, whereas Father claims he made the appointment months in advance and reminded Alan two days prior to the appointment. Father testified that he reminded Alan on Tuesday that the dental appointment was on Thursday, but Alan never responded. Father asserted that Alan did not want to attend the dental appointment, and on the afternoon of the appointment, Alan went to a friend's house to play video games. When Alan was forced to attend the appointment, Alan became "madder than a hen because [Father] made him stop playing games to go to his dental appointment."

**{¶ 52}** After reviewing four of the alleged relationship damaging incidents, it is evident

---

5. It is interesting to note that Mother testified that nothing else happened, other than these two incidents, to cause Alan to want to move in with her and stop visiting Father. This is quite different than the version Alan apparently told the magistrate.

that Alan gets upset when he does not get his way or when he is disciplined. It is typical for a parent-child relationship to suffer some degree of alienation anytime a parent corrects or disciplines his child, and Alan, like any other normal teenager, does not like to be disciplined. Although Father may have handled these situations differently than other parents may have, he was still looking out for Alan's best interests by teaching him morals. Therefore, I cannot place the entire blame for the rift on the father-son relationship on Father's shoulders.

{¶ 53} In order to put Alan's disdain for his Father in proper perspective, one needs to understand the dynamics of how discipline is implemented by each parent. It is clear that Father is the only true disciplinarian of the two parents. Mother takes a more relaxed approach when dealing with Alan, preferring to "discuss" disciplinary matters with Alan. Mother noted that she has "never really had to discipline Alan," but when she must discipline him, she does so by sitting him down and "talk[ing] to him about what * * * the right thing to do [is] * * * [and] what * * * we should do." With respect to visitation with Father, Mother testified that "Alan and I have discussed him going to his dads [sic], to the point of arguing." Mother opined that when Alan turned 16, she believed it should have "be[en] up to him" on whether or not he saw his dad. Mother stated, "I can only encourage him and I don't like arguing with him."

{¶ 54} Father, on the other hand, took a firmer stance with respect to disciplining Alan. Father testified that he "grounded his son from playing [video] games * * * [and] from his cell phone" because his interim report card indicated Alan was missing homework. Father testified that one of the contentions between the two occurred when Father would make Alan turn off his video games in order to do his homework. Alan also grew upset when Father would force him to turn off his video games so that Alan would be in bed by his 10:00 p.m. bedtime.

{¶ 55} Father also took disciplinary action when he caught Alan lying about having a

parent always present to supervise Alan and Alan's girlfriend when they were at the girlfriend's house. After finding out that Alan had used his allowance to buy a pregnancy test for the girlfriend, Father grounded Alan for 30 days, prohibiting Alan from seeing or texting his girlfriend. Father testified that he felt such an action was appropriate as, in his opinion, a child "should be corrected" for lying. Father stated that he did not believe "slapping or beating" the child was an appropriate correction, but rather grounding the child and taking away items special to the child, like an X-box gaming system or the child's cell phone, was an appropriate correction. Father noted that his corrections often created tension between himself and Alan. Despite being informed of Alan's propensity to lie on occasion, to risk getting his girlfriend pregnant at the young age of 16, to get upset when his video game time is circumvented by school work or dental appointments, the trial court still found that Alan was of "sufficient maturity" to warrant consideration of his wishes regarding the allocation of parental rights and responsibilities.

{¶ 56} After reviewing the entire factual background presented in this case, I find that the trial court failed to establish a compelling governmental interest that rose to the level that would justify its infringement upon Father's fundamental parental rights. First, I disagree with the trial court's determination that Father is solely responsible for the strained relationship he has with Alan. There was evidence that Alan was just as much, if not more, to blame for the deterioration in the father-son relationship. Second, I find that there is not one shred of evidence in the record demonstrating that visitation would be harmful in any way to Alan. While other parents may have instilled moral principles in a different fashion, the so-called "questionable" methods by which such principles were implemented by Father certainly do not override Father's fundamental right to instill sound principles in his child or justify the extreme restriction the court placed on his visitation.

{¶ 57} In addition, there are several legitimate reasons why it is in Alan's best interest

for Father to have a more meaningful visitation schedule. The record clearly indicates Father was the disciplinarian in Alan's life, and it was Father who ensured that Alan was taught sound life principles, such as maintaining good study habits, how to manage his time and money, and the importance of telling the truth. The fact that Alan is now 17 years old does not mean that Father should no longer have an active role in the upbringing of his child or that he should be denied the right to instill his sound principles and beliefs in his child. *See Yoder*, 406 U.S. at 232. A 16 or 17-year-old child does not have life's wisdom or the experience necessary to make wise, mature decisions. As Alan will be graduating from high school soon, he will need parental guidance in: (a) selecting a career tailored to his talents and ambitions; (b) choosing a college or university that offers the best curriculum for his chosen vocation; and (c) figuring out the best way to finance his education.

{¶ 58} Furthermore, ordering reasonable visitation with Father in this case will enable Alan to learn another important life lesson, i.e. how to address and resolve relationship conflicts. As Alan ventures out into the "real world," he will find that he cannot simply ignore conflicts with others who play a significant role in his life, like his parents, siblings, spouse, boss, co-workers, subordinates, associates, or friends. By ordering set visitation with Father, Alan will learn how to deal with people and work through conflict, which will enable him to form healthy, rather than dysfunctional, relationships. In combination with mandatory counseling, regular contact or visitation with Father will be useful in repairing the father-son relationship.

{¶ 59} Finally, it is not in Alan's best interest for the trial court to allow Alan to be an integral part of the visitation decision-making process. The trial court pointed out that, if Alan refuses to participate in parenting time with Father, Father may "initiate a proceeding in juvenile court to compel [Alan] to participate in parenting time." This is definitely against Alan's best interests. Forcing Father to drag Alan into juvenile court in order to enforce the

visitation orders of the domestic relations court would, as recognized by the trial court, "alienate the child" and create further difficulties in repairing the father-son relationship. Moreover, initiation of juvenile proceedings by Father could potentially result in Alan having a juvenile record if he continued to refuse to spend time with Father. Father recognized that this would not be in Alan's best interest when he testified that taking Alan to juvenile court was not an option as he "didn't want his son to have a permanent record."

{¶ 60} In order to avoid permanent damage to the father-son relationship, the appropriate measure for the trial court to take that is consistent with Alan's best interest is to add Alan as a party to the post-decree action pursuant to Civ.R. 75(B). This would eliminate Father being perceived as the "bad guy" in Alan's eyes, and would allow the domestic relations court to oversee and enforce its visitation order, as well as the mandatory counseling. It would also provide judicial economy by (1) not incorporating a new judge who is not familiar with the history of the case or the parties, (2) avoiding additional court costs, and (3) avoiding the delay in resolving any disputes by having the matter transferred over to the juvenile court. By incorporating Alan into a civil action, it would also spare Alan from potentially having a juvenile criminal record for disobedience of a court's order. For the reasons stated above, making Alan a party to the civil action would obviously be in Alan's best interest as well as in the best interest of the father-son relationship.

{¶ 61} In support of its holding that the visitation order entered into by the trial court was narrowly tailored and in Alan's best interest, the majority cites to *Jannetti v. Nichol*, 7th Dist. Mahoning No. 97-CA-239, 2000 WL 652540 (May 12, 2000). In *Jannetti*, a father challenged a trial court's decision that all visitation with his 16-year-old son should be suspended. *Id.* at *1. The Seventh District concluded that suspension of visitation was appropriate as the evidence presented to the trial court demonstrated that it was in the child's best interests not to have further contact with the father. *Id.* at *4. There, the record

- 23 -

demonstrated a complete break-down in the father-son relationship. There was evidence that the father had physically abused his son, that the father was irresponsible with alcohol, and that the son thought of his father as a "male prostitute" after learning of the father's sexual affairs with a variety of women and observing the father having intercourse when the child and the child's siblings were present. *Id.* In *Jannetti*, there was not only the child's testimony that he wanted nothing to do with his father, but there was also testimony by a variety of psychologists indicating further contact between the father and child "would be volatile and dangerous to [the child]." *Id.*

{¶ 62} The facts of the present case are unlike those in *Jannetti*. First, there is no expert testimony from a psychologist or counselor that allowing Father to have regular visitation with Alan would be harmful to Alan. Additionally, there is no evidence in the record that Father physically abused his son, abused alcohol, or engaged in inappropriate physical displays of affection in front of his son. Unlike *Jannetti*, prohibiting visitation between father and son does not serve the child's best interests.

{¶ 63} Given the foregoing discussion, I find that based upon all of the evidence admitted into the record, it was not in Alan's best interest to adopt the 16-18 Schedule. As discussed above, it is in Alan's best interest to have visitation with Father. Father should not be denied reasonable visitation merely because Alan, a minor child, does not wish to see his father. The 16-18 Schedule, contrary to the majority's opinion, effectively gives Alan control over Father's visitation rights, which will be discussed more fully below.

### 16-18 Schedule: Not Narrowly Tailored

{¶ 64} As the majority noted in its opinion, the specific issue before this court is whether the trial court's implementation of the 16-18 Schedule was narrowly tailored in this case so that, as applied, it does not violate Father's fundamental interest in the care, custody, and control of his son. Not only was the schedule not in the child's best interest, but the

- 24 -

terms of Father's visitation with Alan were also not narrowly tailored so as to avoid infringement upon Father's protected parental right.

{¶ 65} Both the majority and the trial court deny that Father's substantive due process rights were violated by the implementation of the 16-18 Schedule. In fact, the trial court noted in its June 14, 2013 Decision that:

> The Basic Parenting Schedule for sixteen to eighteen-year-olds accounts for the increased independence and busy schedules of teenagers. As the Court of Appeals further noted, there is a difference in the level of independence between thirteen-year-olds and fifteen-to-sixteen-year-olds. Parenting schedules that account for these differences do not deny non-residential parents their due process rights to parent their children.

The trial court also noted that the "Basic Parenting Schedule is discretionary, not mandatory" and that it "could have ordered an alternative parenting time arrangement," but it decided that the "Basic Parenting Schedule was in the child's best interest." While I agree that older teenagers have an increased level of independence, this does not mean they should be completely independent from their parents, which the schedule, as applied here, allows. Furthermore, there is no mention anywhere in the record or in the court's decision that the schedule is appropriate here due to Alan's "busy schedule." The record does not indicate that Alan was involved in sports, extracurricular activities, or had a job, all activities typical for a teen within this age group. Rather, the record merely establishes that Alan went to school, hung out with friends, and played video games.

{¶ 66} In the eyes of the trial court and majority, Father's parental rights were not violated because the visitation order permits Father to have parenting time as set by Father and Alan. However, contrary to their assertions, the 16-18 Schedule, as applied in this case, enables Alan to be the sole decision maker in determining whether Father can exercise his constitutionally protected right to the care, custody, and control of his child. The 16-18 Schedule provides the following:

> Parenting time for children in this age bracket shall be fixed between the child and the non-residential parent. Parenting time shall not be limited other than as the child and the non-residential parent choose.

The trial court attempted to overcome Father's "assumption that the child will unilaterally determine parenting time under the Basic Parenting Schedule" by substituting the plain meaning of the language contained in the 16-18 Schedule with its own interpretation of the language and its intent in applying it. The trial court noted in its entry overruling Father's objections to the magistrate's decision that "the child and the non-residential parent must come to an agreement regarding the time they will spend together." Subsequently, in its "Decision and Entry upon Remand," the trial court stated:

> The language regarding the non-residential parent and the child choosing the parenting time merely delineates that the authority to schedule the parenting time does not belong to the residential parent. The child is not the sole decision-maker regarding when and whether parenting time will occur.

However, when interpreting a governmental regulation, we look first to the plain and ordinary meaning of the words contained therein. *See Westfield Natl. Ins. Co. v. Young*, 12th Dist. Warren No. CA2005-12-135, 2006-Ohio-5839, ¶ 26 (holding that one must look to the language of the document and "give the terms their 'plain and ordinary meaning'"); *In re M.B.*, 10th Dist. Franklin No. 99AP-922, 2000 WL 860461, * 2 (June 29, 2000) ("[I]n the absence of any ambiguity in the language of the statute, there is no need to resort to consideration of legislative intent. It is only where the words of a statute are ambiguous, uncertain in meaning, or conflicting that a court has the right to interpret a statute"). If there is no ambiguity in the language contained in the regulation, there is no need to look to the intent behind the regulation.

{¶ 67} Here, the language of the 16-18 Schedule is unambiguous and can be construed by using the plain and ordinary meaning of the words contained therein. Thus,

there is no need to look to the trial court's own interpretation of the language or its intent and reasoning behind applying the language to this case. The plain and ordinary meaning of the language set forth in the 16-18 Schedule clearly specifies (1) the individuals who make the decision regarding parenting time ("Parenting time * * * shall be fixed between the child and the non-residential parent"), and (2) the individuals who have the authority to limit visitation ("* * * as the child and the non-residential parent choose"). The 16-18 Schedule is silent as to what happens when, as here, the nonresidential parent desires to have visitation with the child but the child refuses. Because the plain and ordinary meaning of the 16-18 Schedule does not specifically require the nonresidential parent and child to choose any visitation schedule at all, Alan effectively holds Father's parenting rights hostage, as it is up to Alan whether Father can exercise his fundamental right to visitation with his son.

{¶ 68} Furthermore, it is clear that at the time the 16-18 Schedule was implemented, the trial court was fully aware Alan would refuse any contact with Father based on Alan's past refusal to honor the court's previous recommendations and orders and his past refusal to honor his parent's wishes. With respect to the trial court, Alan refused to respect the court's order that required him to spend every other week at Father's residence when he chose to stay exclusively with Mother. Mother even testified that Alan knows that he is breaking the court order by not going to Father's for his week of visitation. Next, Alan refused to abide by the court's recommendation that he attend counseling sessions with Father when the parties pursued mediation to initially address Alan's refusal to spend time with Father. Out of 18 sessions, Alan refused to attend half of them.

{¶ 69} The evidence shows that Alan also refused to honor his parents' directives and requests. As detailed above, Alan resented Father for establishing structure and discipline in his life and refused to honor Father's wishes to continue the existing visitation schedule. Further, although Mother discussed with Alan the need to spend time with Father to the point

- 27 -

the two argued, Alan refused to follow her advice and recommendation that he spend time with Father.

{¶ 70} Knowing that Alan has refused to abide by its previous visitation orders, has refused to attend its previous recommended counseling sessions, and has refused to abide by the wishes of his parents, the trial court still concluded that the 16-18 Schedule provides Father with the opportunity to exercise his parental rights with Alan. This decision was made even after Alan told the magistrate that "he was firmly in favor of residing with Mother and was not open to spending time with Father even for short visits, let alone a week-to-week residency schedule." On top of this, the trial court indicated it had no intentions of forcing Alan to interact with Father. In its October 1, 2012 entry, the trial court stated that it "will not force the issue on a 16 year-old child" whose Father has caused much of the relationship issues and "will not engage in forcing Alan to visit Father, nor will it tell Mother (as Father suggests) how to discipline Alan in that regard."

{¶ 71} I agree with the majority's statement that "whether a parent's substantive due process right to the care custody and management of his or her children is properly observed is situational." However, I dissent form the majority's opinion as I find that the "situation" presented to the trial court at the time it implemented its visitation order did not properly observe Father's substantive due process right to parent Alan. Furthermore, I disagree with the majority's suggestion that Father should have filed a motion for a "set visitation" order if he wanted a specific parenting schedule with Alan. The violation of Father's constitutional right to the care, custody, and management of Alan occurred at the time the trial court imposed its order regarding visitation. The law does not require a person to exhaust all of his or her legal remedies before challenging a trial court's final order on a constitutional basis.

{¶ 72} The court's implementation of its visitation schedule is similar to the trial court's actions in *Guliano v. Guliano*, 11th Dist. Trumbull No. 2001-T-0031, 2011-Ohio-6853, where

a father's visitation with his daughter was limited for a number of years to once a week for a few minutes at the bottom of the residential parent's driveway. In *Guliano*, a 15-year-old daughter did not want to have any interaction with her father or her father's family, despite undergoing mediation and counseling to try to repair their relationship. *Id.* at ¶ 27. The daughter had expressed to the trial court and to the guardian ad litem her desire not to have visitation with her father. *Id.* at ¶ 8. The only parenting time the father had with his daughter from 2004 until 2011 was "weekly driveway visits of short duration at the end of [mother's] driveway" because the trial court did not issue a specific visitation schedule and the daughter resisted any other interaction with father. *Id.* at ¶ 5. The father filed a motion seeking to establish a visitation schedule, but the trial court denied his motion. The Eleventh District reversed, recognizing "the importance of a father's relationship with his child and of his ability to visit with his child." *Id.* at ¶ 54, citing *Eitutis v. Eitutis*, 11th Dist. Lake No. 2009-L-121, 2011-Ohio-2838, ¶ 81. The *Guliano* court stated:

> A noncustodial parent's right of visitation with his children is a natural right and should be denied only under extraordinary circumstances. * * * Extraordinary circumstances include unfitness of the non-custodial parent or a showing that the visitation with the minor child would cause harm. * * *
>
> [Here], there is no evidence of extraordinary circumstances which would even suggest that [father] is an unfit parent or that visitation with him would cause harm to the minor child. In fact, the evidence is to the contrary. [Father] does not pose any harm to the minor child. * * * The minor child simply does not want to visit with her father.

*Id.* at ¶ 54-55. The court further stated that the current visitation order, which resulted in weekly driveway visits for a couple of minutes, was "tantamount to no visitation at all and a divestiture of [father's] natural rights." *Id.* at ¶ 56. The Eleventh District reversed and remanded the matter back to the trial court to grant father "meaningful visitation" with his daughter. *Id.* at ¶ 57.

{¶ 73} Like the daughter in *Guliano*, Alan is a teenager who wishes to have no interaction with his father. In this case, Father was also given a visitation order that was "tantamount to no visitation at all and a divesture" of his natural rights. Since Alan has refused to abide by the court's past orders regarding visitation or counseling and the trial court already indicated it would not force Alan to visit with Father, the court has effectively and completely denied Father's ability to exercise his fundamental right to raise his son.

{¶ 74} To conclude, I would again reiterate that my primary concern with the majority's holding is that it ignores and refuses to continue to protect one of our oldest fundamental liberty interests; that is, a parent's interest in the care, custody, and control of his or her child. The United States Supreme Court and Ohio Supreme Court have shown their own concern for this valuable parental right by adopting only two extraordinary circumstances justifying its infringement by the state. Before restricting a parent's fundamental right, it must be established that the parent is *unfit* or there is *clear and convincing evidence* that visitation presents a *significant risk of serious emotional or physical harm* to the child. The circumstances and "situation" presented here lie far below the type of serious conduct required to justify depriving a parent of their substantive due process right. Only five months passed between the time the parties implemented their shared parenting plan and Mother filed her motion to terminate shared parenting. Nothing in the record demonstrates that Father's conduct was so egregious that Alan needs to be protected from Father's "questionable" conduct or that Alan's best interests are served by denying Father regular and meaningful visitation with Alan. The fact that a shared parenting plan was entered into initially demonstrates that both Mother and the trial court believed Father was capable of adequate parenting. Further, the fact that Father arguably caused a "strain" in his relationship with Alan does not justify denying him of his fundamental right to the care, custody, and control of his son as there was no finding that Father was unfit or that he posed

a significant risk of serious emotional or physical harm to Alan.[6]

{¶ 75} I fear that a parent's right to the care, custody, and control of his or her children will continually be eroded until it becomes an archaic fossil and there will be very little, if any, significance or weight given to a fit parent's desire to maintain visitation and participate in the upbringing of his or her child. The erosion of this right is apparent when looking at several Ohio appellate decisions which have gone beyond the boundaries established by the United States Supreme Court and the Ohio Supreme Court by ruling that it is permissible to cut off the nonresidential parent's protected parental interest when (1) the child is mature enough to decide not to have a relationship with the nonresidential parent, (2) the child independently and affirmatively states his or her desires not to have contact with the nonresidential parent,[7] and (3) where enforcing visitation would serve no useful purpose.[8] The majority and the trial court have carved out yet another circumstance justifying the denial of a fit nonresidential

---

6. The magistrate, in addressing Father's concerns about Mother being designated residential parent, reminded Father that he "agreed to enter into a shared parenting plan with Mother and must have believed that she was capable of adequate parenting, notwithstanding any concerns over anger issues." This same rationale should have applied when the trial court restricted Father's visitation. Both the trial court and Mother approved the shared parenting plan wherein Father exercised visitation every other week with Alan. Less than five months later, Mother sought to terminate the shared parenting plan and to have Alan's visitation with Father modified. At the hearing on her motion, Mother initially testified that she thought Father should get the same visitation schedule she had prior to the shared parenting arrangement, i.e., every Wednesday and every other Weekend. Mother's testimony demonstrates her belief that Father is capable of effectively parenting Alan. Her testimony further demonstrates that she does not believe Father is unfit or that he would pose a significant risk of serious emotional or physical harm to Alan.

7. *See, e.g., Matter of Lamb*, 12th Dist. Butler No. CA95-01-006, 1996 WL 56077, *2 (Feb. 12, 1996) ("Visitation privileges of the noncustodial parent may be denied if the child does not wish to visit the noncustodial parent and forcing visitation would not accomplish any objective"); *In re Jergens*, 2d Dist. Mahoning No. 16848, 1998 WL 336702, *2 (June 26, 1998) ("The courts have long recognized the difficulty in compelling a minor to visit a parent when the minor is mature enough to 'affirmatively and independently' reject such visitation"); *Smith v. Smith*, 70 Ohio App.2d 87, 89 (10th Dist.1980) ("Age must be a central consideration in determining when a minor's reluctance in visiting with the non-custodial parent is enough to prevent visitation").

8. The case law cited by Ohio Appellate Courts can be traced back to a single case arising out of a New York trial court. *See Lieblich v. Lieblich*, 18 Misc.2d 798, 164 N.Y.S.2d 179 (1957). In *Lieblich*, the trial court issued a one page decision granting the parties a divorce and awarding custody of an infant to her mother. In awarding custody to mother, the court held, "[i]nasmuch as it is apparent that the daughter is antagonistic towards her father, no useful purpose will be served by allowing him visitation rights." *Id.* at 799. The New York court, without any analysis or discussion of father's fundamental interest in the care, custody, and control of his child, terminated father's constitutionally protect right and denied him visitation with his infant daughter on the sole rationale that she was "antagonistic" towards him. I find that the rationale expressed in *Lieblich* lacks not only a rational basis but, more importantly, a constitutional one.

parent's right to have visitation with his or her child, i.e., where the parent's methodology is questionable when implementing sound life principles.[9] The problem parents now face in contested visitation cases is trying to guess which methodologies are going to be state approved and which methodologies are going to be "questionable," justifying a restriction on this constitutionally protected parental interest.

{¶ 76} Given the importance the United States Supreme Court and Ohio Supreme Court has placed on a parent's fundamental liberty interest in the care, custody, and control of one's child, I would find that the trial court hindered Father's ability to exercise his parental rights. Unless it can be established that the nonresidential parent is unfit or there is clear and convincing evidence that such contact presents a significant risk of serious emotional or physical harm to the child, there is no justification for restricting Father's visitation with Alan merely because his methodologies of implementing sound principles were questionable. Therefore, while I applaud the trial court's attempt to salvage the father-son relationship in this case by ordering counseling, I find that the overall visitation order is insufficient to protect Father's long-recognized, natural right to parent. Based on the facts of this case, I would find that the implementation of the 16-18 Schedule, as applied, violated Father's fundamental parental rights because it was not narrowly tailored, and would remand the case so that the trial court can establish a specific, meaningful visitation schedule for Father.

---

9. To date, neither the United States Supreme Court nor the Ohio Supreme Court have adopted or approved any of the additional extraordinary circumstances that have been utilized by the Ohio Appellate Courts.